REINHARDT *v.* SAGINAW-BAY CITY RAILWAY CO.

1. STREET RAILWAYS — CONTRIBUTORY NEGLIGENCE — UNLAWFUL SPEED—PERSONAL INJURIES—HIGHWAYS AND STREETS.

Where plaintiff was driving alongside defendant's track in a public street, and, because of certain piles of bricks placed beside and near the tracks and of other vehicles standing in the street, was compelled to turn his horses upon the track and drive along the same partly between the rails, and where plaintiff claimed that he looked and saw no street car behind him, and it appeared that the track was straight, the view of the motorman unobstructed and that the motorman knew the conditions existing at the place of the collision, and there was testimony tending to show excessive speed, the court did not err in submitting to the jury the question of contributory negligence.

2. SAME—DUE CARE—OPERATION OF CAR.

The question of whether defendant's motorman exercised ordinary care in observing the conditions and in maintaining control of his car, became a question of fact under the evidence and the trial court did not err in submitting the issue as to the motorman's negligence to the jury.

BROOKE, C. J., dissenting.

Error to Bay; Collins, J. Submitted April 15, 1915. (Docket No. 55.) Decided June 7, 1915.

Case by August Reinhardt against the Saginaw-Bay City Railway Company for the killing of plaintiff's horse. Judgment for plaintiff. Defendant brings error. Affirmed.

*Weadock & Duffy,* for appellant.

*Charles W. Hitchcock,* for appellee.

STONE, J. Action on the case to recover damages for the alleged negligent killing of plaintiff's horse,

and injuring his vehicle, occasioned by collision with one of defendant's cars which plaintiff claimed was being run at an unlawful rate of speed. Washington avenue, one of the principal streets of Bay City, runs north and south. The defendant has double tracks in this street from Center street on the north and beyond, to Columbus street on the south; the distance between the east rail of defendant's east track and the east curb being 21 feet.

Along the east rail of the east track and south of Seventh street, at the time of the accident in question, the Bay City Gas Company had made certain excavations for repairs to gas mains. Due permission had been granted to said gas company to make such excavations. The bricks from the excavations had been placed alongside thereof in piles, 7 in number, all three feet from the east rail of the east track, and they ranged from between 16 and 17 feet from the east curb of the street. The piles were all from 12 inches to 14 inches high. McKinley avenue (or Eighth street as it is sometimes called in the record) is the next intersecting street south of Seventh street, and the length of the block between said streets is 300 feet.

Between two and three o'clock of the afternoon of February 28, 1913, the plaintiff and his 19-year old son were driving north on Washington avenue on the traveled portion of the street in said block, east of the east car track, the son driving and seated in the front seat, the plaintiff sitting in the back seat. They had a team of horses, and the vehicle was a covered surrey, with the side curtains down. After they had passed the intersection of McKinley avenue the boy stopped the team and waited for a city street car to pass them (going in the same direction as they were). After the street car had passed, it is the plaintiff's claim that the boy then turned the team to the left

which placed one horse west of the east rail of the
east street car track, and the other horse east of the
rail; that before turning back into the traveled por-
tion of the street, the horse that was west of the east
rail was struck by one of defendant's interurban cars
running north, and following the said city street car;
that the turning to the left was on account of the said
piles of brick along the side of said east rail, and the
vehicles and teams at the east curb.   The day was
clear, and from the point where the horse was struck,
Washington avenue could be viewed several blocks to
the south.   Upon the trial plaintiff's son testified that
he looked before turning the horses onto the track
and saw nothing.

It was uncontradicted that the motorman of the
interurban car had made a stop at Ninth street, the
next street south of McKinley avenue, and had let off
a passenger there, and that as he was passing from
McKinley  avenue  to  Seventh  street,  he  had  re-
ceived a signal to stop the car for Seventh street;
the motorman testified that in response to such signal
he threw off the power about 50' feet north of Mc-
Kinley avenue, and that from this point to the time
the horse was struck, the current on the car had not
been applied, except to reverse the car after the
plaintiff's son had turned the horses in ahead of the
car, at a distance of about 15 feet from the car.
There was a conflict in the evidence as to the speed
of the car; the evidence on the part of defendant be-
ing that as it passed the intersection of McKinley
avenue the speed was about 7 miles per hour, while
there was evidence on the part of the plaintiff that
the rate of speed at that point was 16 to 20 miles an
hour, and that the speed was not slackened until the
collision.   The motorman also testified that he first
observed the team about the middle of the block be-
tween Seventh street and McKinley avenue; that it

was on the right-hand side of the street, about six feet from the east rail of the track; that as he approached the team he sounded the gong heavily, and that the gong had been sounded as he came along on Washington avenue, and right up until he saw the team start to turn in, about 15 feet ahead of him, when he blew the whistle and did all in his power to prevent the collision. The car went about the length of itself after hitting the horse, when it was stopped. The length of the car was 52 feet 5 inches.

The degree of care exercised by the plaintiff and his son in driving the team onto the track, as testified to by them, was as follows: The son, who was driving the team, testified on direct examination:

"*Q.* When you got down somewhere near where the accident happened, state whether or not there was a street car passed you?

"*A.* Why, we heard one and I slackened up and stopped the horses for about a second, I guess, or so, and waited until it was passed, and then I turned over, and I kind of looked on the side as far as I thought there would not be any danger, and I didn't see anything in sight.

"*Q.* Which way would you say you turned?

"*A.* To the left.

"*Q.* When you turned to the left state whether or not that took you out on the car tracks?

"*A.* Why just the one horse was on the track and the other on the other side.

"*Q.* Why did you turn to the left?

"*A.* Why there were rigs tied in there crossways, and I couldn't get through there.

"*Q.* What prevented you going through, if anything?

"*A.* Well, the piles of bricks, and the rigs tied there. * * *

"*Q.* What is the first thing you can tell us about the collision?

"*A.* All I know is it hit the horse, and that is all I know, and pushed the horse down on its knees, and then the tongue broke, and then that ran into the horse, and then it broke off. * * *

"*Q.* What do you say as to the way you were driving the team that day?

"*A.* Oh, they was going slow like.

"*Q.* Were you paying any attention to your business and watching the team?

"*A.* Sure I was paying attention, so there would not be any danger, always."

On cross-examination he testified:

"*Q.* The first thing you knew the horse had been struck?

"*A.* That is the first thing I knew.   *   *   *

"*Q.* And you were sitting in the front seat and nobody with you?

"*A.* Sure, just us two.  My father sat alone in the back seat.

"*Q.* The rig was covered, wasn't it?   .

"*A.* Yes.   *   *   *

"*Q.* It had a curtain in the back end, a drop curtain?

"*A.* Yes.

"*Q.* And curtains in the side?

"*A.* Yes.   *   *   *

"*Q.* How far up to the front did they come?

"*A.* They commenced about the end of the seat.

"*Q.* And they started up from there and they went clear back?

"*A.* Yes, but they were open on the side—both sides.

"*Q.* How open?

"*A.* There is a place where you go in the back, in the double rig.   *   *   *

"*Q.* And that was in the seat where your father would be sitting?   ·

"*A.* Yes.

"*Q.* And up to where you were they came right straight up from the end of the seat?

"*A.* Yes.   *   *   *

"*Q.* Where were you when that car passed you?

"*A.* Why just about 15 or 20 feet from the rigs.

"*Q.* Fifteen or twenty feet from the first rig that stood in front of the store?

"*A.* Yes.

"*Q.* Did you stop?

186 Mich.—27.

"*A.* I stopped.   Stopped until the street car was passed, a second.

"*Q.* The horses stood until the car went by?

"*A.* Yes.

"*Q.* And then you drove on?

"*A.* Yes.

"*Q.* When you thought the car had passed?

"*A.* Yes, the car went past.   *   *   *

"*Q.* And then you started to drive across the track where you would get more room, didn't you?

"*A.* Yes.

"*Q.* And you turned the horses after the car went by, and drove right straight on across the street?

"*A.* I didn't go across the street.

"*Q.* You started to go out to the left?

"*A.* Yes, I turned to the left.

"*Q.* After the car went by you, didn't you?

"*A.* Yes, and I looked out  on the side, and as I turned around to look back a little, and I couldn't see nothing.

"*Q.* When you turned to the left that little window in the back would be pointing kind of not right straight back to the street, but off a little bit, wouldn't it?

"*A.* Yes, I didn't look out the back window, I looked out in front.

"*Q.* The curtains would shut off the street back of you, wouldn't it?   Which side did you lean out on?

"*A.* On the right-hand side.

"*Q.* And you looked back of you then?

"*A.* Yes.

"*Q.* And didn't you see any car?

"*A.* I couldn't see none.   *   *   *

"*Q.* After this street car went by, you then turned a little bit to be out of the way of the brick piles on the road?

"*A.* The brick piles were along there, and I had to drive on the track  to  get  around, I couldn't drive through there.

"*Q.* You started to do that right after the car went by?

"*A.* Yes.

"*Q.* And you drove over to the left from where you had been driving?

"*A.* Yes.

"*Q.* And the horses got partly on the track?

"*A.* Yes, they did.

"*Q.* And you were turning off again?

"*A.* Yes.

"*Q.* When the car struck you?

"*A.* When the car hit.

"*Q.* When the car went by you thought it was the only car there, and it was safe to go by, isn't that true?

"*A.* Well, I looked back first because I know lots of times I saw two of them coming, and I looked back.

"*Q.* You saw this car that went by you?

"*A.* Sure, that is the reason I stopped.

"*Q.* When it went by you drove ahead?

"*A.* Sure.

"*Q.* You didn't know there was another car behind there?

"*A.* No, if there was I wouldn't have been fool enough to drive on there.

"*Q.* When this first car went by you felt it was safe to drive on the track and you did, didn't you?

"*A.* Yes.

"*Q.* And you didn't look again after that car went by you?

"*A.* Yes, I looked after the car went past by, and I went onto the track.

"*Q.* You didn't look back?

"*A.* On the side of the curtain I looked back.

"*Q.* Did you look back to the south?

"*A.* Yes.

"*Q.* And you didn't see a car?

"*A.* I didn't see anything as far as I could see.

"*Q.* How far could you see?

"*A.* I could see—I couldn't say how many blocks back.

"*Q.* And just as you were turning off, another car came along and struck the horse?

"*A.* Yes."

The witness testified that he did not hear any gong or bell.

The plaintiff testified on direct examination as follows:

"Curtains were on the rig, and the front end of the

curtain comes up like buggy slanting, and I had the back curtain hanging down partly so I could see out. That was true on both sides. Just before the accident occurred I heard a street car. When the car came by my boy was driving, and as far as I can remember he slacked up and let the street car pass. He was driving along, and I looked out, and I noticed him looking kind of sideways, and looking back, in driving over after the street car had passed, to get past the brick piles. I looked back also. I saw no car coming. * * * In driving out until we got onto the track the next thing I noticed a street car hit us. * * * When I looked back after the street car passed, I didn't notice anything. * * * A city car went by. We slacked up to let that go by. * * * We stopped at a standstill. We had to, to let the car go by.

"*Q.* Why couldn't you stop and let the other car go by?

"*A.* Because we didn't see any reason to stop.

"*Q.* You didn't see it?

"*A.* No, sir. From where I was I did look. I looked on the left-hand side of my rig, lifted the curtain. I did that when the city car went by."

Plaintiff testified that he did not hear any bell. There was testimony to the effect that the car was between McKinley avenue and Ninth street when the team went onto the car track, and that the team traveled astride of the track about 75 feet before it was struck.

Ordinances of the city were offered in evidence, one to the effect that cars should be run at a rate of speed not to exceed eight miles an hour, schedule time, in the part of the city where the accident occurred; and another to the effect that a car should at all times be entitled to the right of way over all its tracks, and that every vehicle upon the track of the railway should turn out when a car approached so as to leave the track unobstructed.

At the close of the plaintiff's testimony, and again at the close of all the testimony, defendant's counsel

moved for a directed verdict in its favor by reason of the contributory negligence of the plaintiff. This was denied and exception taken. The defendant requested the court to charge the jury that the conduct on the part of the plaintiff was contributory negligence, even though the car may have been running at an excessive rate of speed, prohibited by the ordinance of the city. That if the above request was refused, then defendant requested the court to charge the jury as set forth in 16 lengthy requests to charge. We have examined each of said requests, and are of the opinion that the charge of the court, as given, gave the substance of such requests as were proper, and properly submitted to the jury the questions involved in the case.

There was a verdict and judgment for the plaintiff for the value of the horse killed, and for damages to the vehicle. There was a motion for a new trial based upon the refusals to charge as requested, and for alleged errors in the charge. The motion was denied. In giving its reasons for such denial the court said:

"As to the portions of the charge pointed out as erroneous in the motion, and as to the requests refused, of which complaint is made therein, I have to say that I believe the charge sets forth the law correctly upon the points thus particularized."

The reasons filed were duly excepted to, and defendant has brought the case here for review, assigning errors upon rulings of the court in the admission of testimony; in the charge of the court; and in overruling defendant's motion for a new trial.

The assignments of error are upon the following parts of the charge:

"(9) This is the case of *August Reinhardt* v. *Saginaw-Bay City Railway Company.* This suit grows out of a transaction which occurred on the 28th day of February, 1913. There is no dispute about the

date. The place of the occurrence is on Washington street between Seventh and Eighth streets in Bay City, and opposite what is known as the Hine Block or nearly so. At the time and place in question the plaintiff and his son were in a carriage driven by the son, going north on Washington street close to the street car, and at a certain time under certain circumstances they turned onto the street car [track], following which they were struck by an interurban car. These facts to that extent are practically undisputed, and the horse was killed as the result of the accident, and that is undisputed."

"The question is as to whether or not the defendant has been guilty of such actionable negligence as to make it liable for this injury. The plaintiff claims that the defendant was so negligent, and is so liable, and this the defendant denies."

"(10) Now, gentlemen, have in mind during this whole transaction this situation there on Washington street at the place in question, the street car tracks there, and it appears that certain excavations had been made along the side of the track and that holes were there, and the piles of substance at the side, and it is the claim of the plaintiff and not disputed that there were teams hitched along the east side next to the east curb line of Washington street. I call your attention to these circumstances because you shall have them in mind, but I am not undertaking to accurately describe any condition there, for that is for you to consider and determine for yourselves."

"(11) The defendant claims that the car was going north, interurban car; that just after or about the time it left Eighth street the motorman got a signal—after they left Eighth street, I think—to slow up for the next crossing, at Seventh street. That the car had slowed up, that the power was thrown off at the time and place in question, and that the car was going along at not to exceed six miles an hour, and that just before the horse was struck the plaintiff drove onto the track, and that after that had been done the defendant's agent used all the power it could and did not stop the car, and that, therefore the defendant claims that the plaintiff was negligent and that the defendant was not negligent." ·

"(12) That I have already referred to and I did

not intend to make it important by calling attention to it again, but give it because it gives another phase of the case."

"(13) If you find from the evidence in this case that at the time the plaintiff drove onto this track the car was so close to him that he could have discovered that the car was approaching by the use of reasonable diligence—I will withdraw that and start in again on that. If you find from the evidence in this case that at the time the plaintiff drove onto defendant's track the car was so close to him that he could have seen the car by the use of reasonable diligence and could have seen by the use of reasonable diligence that the car was approaching him, and that when he drove upon the track the motorman of the car could not, with the use of the means at his hands, stop the car in time to prevent an accident, then your verdict must be for the defendant."

"(14) If you find from the evidence in this case that the plaintiff turned his horse from a place of safety in the traveled portion of the highway, even though he did so to avoid an obstruction in the street, and turned onto the defendant's track in front of the car, which by the use of reasonable diligence he could have plainly seen approaching from the rear, then I charge you that the plaintiff was guilty of contributory negligence, even though no bell was rung or whistle blown, and even though the car was run at a rate of speed prohibited by the ordinance in evidence."

"(15) Now, gentlemen of the jury, it is your duty to go over this testimony carefully and consider all of the circumstances in the case, consider the testimony that has been placed before you by counsel, weigh the testimony of each witness which, as I have said in other cases in your hearing and to you, you are the judges of the credibility of the witnesses in the case, and in giving your best judgment in weighing the testimony you have the right to believe or disbelieve the whole or any part of the testimony of any witness. I advise you first to take up the question as to whether or not defendant is liable at all, and that question depends upon the other questions which I have stated to you, and which I have undertaken to charge you upon."

1. In our opinion the most important question in the case is whether the court erred in not directing a verdict for the defendant on the ground of the claimed contributory negligence of the plaintiff. Upon that subject defendant's counsel have cited and rely upon the following cases: *Wood* v. *Railway Co.,* 52 Mich. 402 (18 N. W. 124, 50 Am. Rep. 259); *Fritz* v. *Railway Co.,* 105 Mich. 50 (62 N. W. 1007); *Davis* v. *Railway,* 162 Mich. 240 (127 N. W. 323); *Cardinal* v. *Railway Co.,* 165 Mich. 155 (130 N. W. 627); *Measel* v. *Railway,* 166 Mich. 688 (132 N. W. 453); *Puffer* v. *Traction Co.,* 173 Mich. 193 (139 N. W. 19); *Colborne* v. *Railway,* 177 Mich. 139 (143 N. W. 32).

In the *Wood Case* plaintiff drove upon a street railway track, in front of an approaching car without looking around, until the car struck the vehicle. In the instant case there was evidence that the driver did look around before driving upon the track, and saw no car approaching. But the defendant says the car was there, and he should have seen it. Whether the car was there, or in the immediate neighborhood, or within view, is one of the controverted questions in the case. If the car was coming on at the rate of 20 miles an hour, as testified to by one witness, then it was traveling at the rate of one-third of a mile a minute. If this was true, and it took the plaintiff only one-half of a minute to go upon the track after looking, the car may have been more than two blocks away when he looked, and under such circumstances we could not say, as matter of law, that plaintiff was guilty of contributory negligence in going upon the track to get by the obstruction.

An examination of each of the above-cited cases will show that they are readily distinguished from the instant case upon the facts as claimed by the plaintiff. We are of the opinion that the trial court

did not err in refusing to direct a verdict for the defendant.

2. We find no reversible error in the rulings of the court relating to the admission of testimony.

3. Was there error in the charge? In parts of the charge upon which no error is assigned the court called attention to the ordinances of the city which were in evidence and said:

"If it is a fact that the car was running more than eight miles an hour, that is evidence that the company was negligent. It is not, however, conclusive evidence of negligence, because it must appear, before there is any actionable negligence, that the speed of the car was the cause of the negligence; but if the car was going at more than eight miles an hour, that is a circumstance to be considered by you as bearing upon the question."

The court also charged the jury as requested by defendant as follows:

"The defendant company in the operation of the car in question had the right of way, and it was the duty of plaintiff to yield to the company the right of way on its tracks, and to not negligently place himself, or vehicle, in a dangerous position."

The court then added the language upon which error is assigned in the twelfth assignment of error. We find no error in this remark. While defendant had the right of way on its track, it does not follow that plaintiff had not the right, under the circumstances as claimed by him, to drive upon the track. The evidence shows that the motorman knew the conditions which existed at the place of the collision. He testified that that was his fifth trip that day, and that the piles of brick were there all of the time; he could not say how long they had been there, and that they extended as far south as the south side of the Hine building, which was the middle of the block. It was his duty to observe the conditions there, and

to have his car under control. Whether he did perform this duty, became a question of fact under the evidence. After a careful reading of the entire charge we are of opinion that the case was fairly presented to the jury. As stated by the court in denying the motion for a new trial:

"In some parts of the charge the language is not as clear as it might be, but I think, taking the charge as a whole, upon such questions where it is not so clear, the charge did not mislead the jury."

The court did not err in overruling defendant's motion for a new trial.

Finding no reversible error in the record, the judgment of the circuit court is affirmed.

McALVAY, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred with STONE, J.

BROOKE, C. J. (*dissenting*). I am of opinion that plaintiff should be held guilty of contributory negligence as a matter of law under the cases cited upon that point in Justice STONE'S opinion.